■ ERC 16W LIMITED PARTNERSHIP, Appellant, v XANADU MEZZ HOLDINGS LLC et al., Respondents. [943 NYS2d 493]—

Order, Supreme Court, New York County (Bernard J. Fried, J.), entered September 27, 2010, which, to the extent appealed from as limited by the briefs, granted defendants' motion to dismiss the first four causes of action, modified, on the law, to deny the motion as to the first, second and fourth causes of action, and otherwise affirmed, with costs to plaintiff.

Plaintiff ERC 16W Limited Partnership (ERC) is the borrower under a $1.015 billion "Construction Loan Agreement," dated March 30, 2007 (hereinafter, the loan agreement), intended to finance the development of the Meadowlands Sports Complex in East Rutherford, New Jersey. Defendant Xanadu Mezz Holdings LLC (XMH) was not one of the "Lenders" that was originally a party to the entire loan agreement. Rather, XMH was a "Closing Date Participant," meaning that it was assigned a participation interest in the loan pursuant to a participation agreement, also dated March 30, 2007, to which ERC is not a party. As a closing date participant, XMH executed the loan agreement (as stated over its signature thereto) "for the sole purpose of acknowledging its agreement to Sections 2.9.2 (e), (f) and (g) and Section 2.11" thereof.

In the first cause of action of the amended verified complaint, ERC asserts a claim against XMH for breach of the loan agreement based on XMH's failure to fund its ratable portion of advances on the loan that were called for in January, February, March and April of 2009. Supreme Court granted XMH's motion to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7), holding, with regard to the first cause of action, that the portions of the loan agreement to which XMH was a party— the aforementioned sections 2.9.2 (e), (f) and (g) and section

2.11—did not obligate XMH to fund the loan.[1] The court agreed with XMH that any obligation XMH had to fund the loan arose solely from the participation agreement, to which ERC was not a party and which expressly precludes the construction of any of its provisions as "be[ing] for the benefit of or enforceable by any Person not a party hereto."

On ERC's appeal, we determine, as a matter of law, that the provisions of the loan agreement to which XMH is a party unambiguously create a contractual obligation running from XMH to ERC to fund advances on the loan. The first of these provisions, section 2.9.2 (e), provides in pertinent part: "Borrower [ERC] agrees that *for purposes of funding Advances hereunder and funding any Deficiencies,* the Lender holding the $485MM Note shall not be responsible for funding its Ratable Share of each Advance; instead, *each Closing Date Participant shall be treated in the same manner as each Lender, with each such Closing Date Participant holding a Ratable Share equal to its Closing Date Participant Share and a Maximum Commitment equal to its Closing Date Participant Maximum Commitment,* and the provisions of Sections 2.9[.]2 (f) and (g) below shall govern the failure of any Closing Date Participant to fund its Closing Date Participant Ratable Share of any Advance on the Requested Advance Date" (emphasis added). The requirement that each participant "be treated in the same manner as each Lender" with regard to, inter alia, its "Closing Date Participant Maximum Commitment"—a term defined by the loan agreement to mean the participant's *"obligation . . .* to fund Advances of the Loan to Borrower" (emphasis added)—can only mean that each closing date participant is obligated to fund advances on the loan to the extent of its interest. Stated otherwise, the use in section 2.9.2 (e) of the defined term "Closing Date Participant Maximum Commitment" incorporates by reference the statement in the definition of that term that a closing date participant has an "obligation . . . to fund Advances of the Loan to Borrower."

It does not follow from the foregoing conclusion that a closing date participant assumed all of the obligations of a "Lender" set forth in the loan agreement. The requirement of section 2.9.2 (e) that a participant "be treated in the same manner as each Lender" is modified immediately thereafter by the provision setting forth the portion of each advance for which each closing date participant is responsible; hence, a participant is to "be treated in the same manner as [a] Lender" only for

---

**1.** The remaining causes of action at issue on this appeal are discussed later in this writing.

purposes of the obligation to fund advances on the loan. This is confirmed by the phrase "for purposes of funding Advances hereunder and funding any Deficiencies" in the opening clause of the sentence, which naturally modifies the sentence as a whole. Also unavailing is XMH's argument that the phrase "Borrower [ERC] agrees" at the beginning of the sentence implies that the sentence creates obligations on the part of ERC alone; XMH, in executing the loan agreement as a closing date participant, expressly "acknowledg[ed] its agreement to Sec-. tion[ ] 2.9.2 (e)," meaning all provisions of that subsection. Moreover, the opening phrase "Borrower agrees" merely reflects that only ERC, as borrower, could agree to release a lender from its promise to fund the loan, but other provisions referenced in the sentence involved rights and obligations of all parties, including the closing date participants.

Also pertinent is section 2.9.2 (f), which provides in pertinent part: "If and to the extent that any Closing Date Participant (the 'Defaulting Closing Date Participant') shall not have made available to Agent [under the loan agreement] on the Requested Advance Date its Closing Date Participant Ratable Share of any Advance . . . , Agent shall notify the Lenders, the other Closing Date Participants and Borrower *of such default*. Each of the Closing Date Participants agrees that *Borrower* [ERC], Agent or any of the other Closing Date Participants *shall have the right to proceed directly against any Defaulting Closing Date Partici- pant in respect of any right or claim arising out of the default of such Defaulting Closing Date Participant hereunder*" (emphasis added). The first of the two sentences just quoted establishes that a closing date participant's failure to fund an advance due on the loan in accordance with its "Closing Date Participant Ratable Share" (a term defined to mean "the percentage that such Closing Date Participant's Maximum Commitment then constitutes of the Maximum Commitment of the holder of the $485MM Note") constitutes a "default." Plainly, failing to fund the loan could constitute a "default" only if the closing date participant is obligated to provide such funding. The next sentence provides that ERC, as borrower, has "the right to proceed directly against any Defaulting Closing Date Partici- pant in respect of any right or claim arising out of . . . [its] default . . . hereunder." Again, the natural implication of the language is that failing to fund the loan is a "default" under this very provision.

XMH argues that the language entitling ERC "to proceed directly against any Defaulting Closing Date Participant" extends "only to the exclusive remedies provided in Sections

2.9.2 (e), (f), (g), and 2.11" (meaning, in substance, termination and transfer of the defaulting participant's interest and its indemnification of the agent, lenders, and other closing date participants). This construction is not tenable. The contractual remedies to which XMH refers (and which the loan agreement itself does not characterize as "exclusive") are primarily for the benefit of parties other than the borrower, yet the borrower is expressly afforded "the right to proceed directly against [the] Defaulting Closing Date Participant." If these sophisticated parties had intended, at the same time they agreed that ERC would "have the right to proceed directly against any Defaulting Closing Date Participant," to bar ERC from seeking the aid of the courts to require a defaulting participant to honor its obligation to fund the loan under sections 2.9.2 (e) and (f), they would have expressly so provided.

The dissent asserts that the provision of section 2.9.2 (f) entitling ERC, as borrower, to "proceed directly" against a defaulting closing date participant means nothing more than that ERC may "obtain an Eligible Assignee to replace [the] Defaulting Closing Date Participant" as provided in section 2.9.2 (g). Specifically, the dissent takes the position that the only way in which ERC is entitled to "proceed directly" against a defaulting closing date participant is to enforce its right to require the defaulting participant to assign its interest to an eligible assignee. Obviously, this right is of little use in the event a willing and eligible assignee cannot be found, as appears to be the case here. In any event, we reject this counterintuitive reading of the loan agreement.

The dissent does not explain how one can tell that the provision of section 2.9.2 (f) permitting ERC to "proceed directly" against a defaulting closing date participant means only that ERC may force an assignment to a substitute for the defaulting participant; no such limitation is expressed in section 2.9.2 (f). Again, the relevant sentence of section 2.9.2 (f) states: "Each of the Closing Date Participants agrees that Borrower, Agent or any of the Other Closing Date Participants shall have the right to proceed directly against any Defaulting Closing Date Participant in respect of any right or claim arising out of the default of such Defaulting Closing Date Participant." As previously discussed, section 2.9.2 (e)—to which each closing date participants is a party—gives rise to an obligation, owed by each closing date participant to the borrower, to fund its assigned portion of the loan. It follows that the failure of a closing date participant to provide such funding when due constitutes a breach of contract subjecting it to a "claim [by the borrower]

arising out of [the closing date participant's] default," on which claim the borrower may "proceed directly" against the defaulting closing date participant. Given that XMH was directly obligated to ERC to fund its portion of the loan, we see nothing in the governing documents that compels, or even supports, the dissent's narrow reading of ERC's "right to proceed directly" against XMH.

At bottom, the position of XMH and the dissent that ERC cannot state a claim for breach of contract based on XMH's default in meeting its loan-funding obligation rests on the premise that we should look beyond the actual governing provisions of the loan agreement and assume that this deal was a typical loan syndication. Both parties agree that, in the typical loan syndication, there is no direct contractual relationship between the borrower and loan participants who have been assigned their interests by the lender with which the borrower contracted; the contracting lender remains obligated to the borrower for the full amount of its commitment, regardless of any assignment of participatory interests. The written agreements documenting this transaction establish that this is not what occurred here. In specified provisions of the loan agreement to which XMH made itself a party, ERC excused the lenders with which it contracted from responsibility for funding the portions of the loan assigned to participants (as provided in section 2.9.2 [e]) and, at the same time, received the right to proceed directly against such participants in the event they defaulted (as provided in section 2.9.2 [f]).

Even if the contractual provisions at issue could be described as ambiguous on the issue of ERC's right to sue XMH for failing to fund its portion of the loan—and, for the reasons already discussed, we conclude that no such ambiguity exists—we would reject the construction of the relevant sections of the loan agreement advocated by XMH and the dissent. That proposed construction—under which ERC supposedly agreed (in a departure from usual practice) to excuse the contracting lender from its obligation to fund assigned portions of the loan but received in exchange no right to compel the assignees (such as XMH) to honor their funding commitments—would essentially place ERC at the mercy of a defaulting assignee for which no substitute could be found. The unfairness and commercial unreasonableness of depriving ERC of the ability to compel any party to come forth with the promised financing would be compounded by ERC's obligation under the loan agreement to fund itself any deficiency in the financing not cured within 60 days. In the absence of express language compelling such a

harsh result, we find this construction untenable as a matter of law. It is a longstanding principle of New York law that a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided (*see Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 84 NY2d 430, 438 [1994]; *see also Greenwich Capital Fin. Prods., Inc. v Negrin*, 74 AD3d 413, 415 [2010] ["a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties" (internal quotation marks and citation omitted)]; *HGCD Retail Servs., LLC v 44-45 Broadway Realty Co.*, 37 AD3d 43, 49-50 [2006] [same]).

We reject the dissent's position that denying ERC any remedy for XMH's default, in the absence of language unambiguously barring such a remedy, would not be a "harsh result." It appears to be the dissent's view that ERC, in the belief that participation in the loan would remain as attractive to lenders in the future as it was at closing in 2007, decided to assume the risk that a defaulting loan participant could not be replaced. Initially, it should be noted that this appeal arises from a motion addressed to the pleadings, not one for summary judgment; CPLR 3211 gives no warrant for dismissing a complaint based on a transaction's economic and commercial background even if such conditions are attested by evidence in the record, which they are not here. More fundamentally, as should be evident from our discussion up to this point, we see no evidence in the governing documents for the dissent's theory that a sophisticated party such as ERC threw caution to the wind and agreed to leave itself without a remedy in the event no substitute could be found for a loan participant that failed to honor its commitment. Obviously, the loan's rate of return and other terms, no matter how favorable, could not guarantee that participation in the project would continue to be attractive to potential lenders; general economic conditions and a borrower's creditworthiness are, needless to say, subject to change.

It seems to us that, to the extent the dissent is accurate in asserting that XMH received a "high rate of return" for participating in the loan, XMH assumed the risk that, if the economic climate worsened, lending money to ERC might be a less attractive proposition at the time an advance of funds became due. Even if the relevant contractual provisions were somehow ambiguous (and they are not), we would decline to relieve XMH of this inherent risk in the deal it made. By the same token, we would decline to impose on ERC the risk that would arise from

having no remedy against a loan participant that dishonors its commitment and for which no substitute can be found. Again, section 2.9.2 (f) of the loan agreement affords ERC "the right to proceed directly against any Defaulting Closing Date Participant in respect of any right or claim arising out of [its] default," and nothing in the relevant contractual provisions suggests that this "right to proceed" does not include a lawsuit for breach of contract.

The first cause of action also survives the motion to dismiss based on ERC's alternative theory that XMH became a "Lender" under the loan agreement—and thus was bound by the obligation of a "Lender" under that agreement to fund the loan—through a post-closing assignment that was not fully disclosed to ERC. While ERC was not provided with a copy of a post-closing assignment, it has pleaded sufficient facts circumstantially suggesting that such an assignment took place to require denial of the motion to dismiss, on which all reasonable inferences must be drawn in favor of the pleader. On November 10, 2008, following XMH's default in funding, the parties to the loan agreement and the participation agreement executed a "Cure and Reinstatement Agreement" (the cure agreement), the preamble to which refers to certain post-closing transfers and assignments among the lenders and/or closing date participants. Exhibit A to the cure agreement, setting forth the revised holdings of the parties after the transfers, identifies XMH as both a "Lender" and a "Closing Date Participant." In addition, in separate correspondence dated after the execution of the cure agreement, both XMH's counsel and the agent for the lenders referred to XMH as a "Lender." In view of this circumstantial evidence that a change in XMH's status under the loan agreement occurred, ERC is entitled to pursue discovery on that question.

The second cause of action alleges breach of the cure agreement. While the cure agreement expressly provides that it reaffirms, without expanding, XMH's preexisting obligations under the loan agreement and the participation agreement, a breach of those preexisting obligations would constitute a breach of the cure agreement, as well. Accordingly, the second cause of action should not have been dismissed.

The third cause of action, for breach of the implied covenant of good faith and fair dealing, is duplicative of the first and second causes of action, for breach of the loan agreement and the cure agreement, respectively, which we are reinstating. Accordingly, we do not disturb the dismissal of the third cause of action (see *AJW Partners LLC v Itronics Inc.*, 68 AD3d 567, 568-569 [2009]).

The fourth cause of action alleges breach of contract by defendant Lehman Brothers Real Estate Mezzanine Partners, L.P. (Lehman), which "guarantee[d] the obligations of [XMH], including, without limitation, its Future Funding Obligations under the Participation Agreement." The participation agreement defines the term "Future Funding Obligation" as "the obligation of each Holder [defined as the holder of a participation interest, including XMH] to make future advances under and in accordance with the terms of this Agreement and *the Construction Loan Agreement* up to such Holder's Maximum Commitment" (emphasis added).[2] Thus, by its terms, Lehman's guarantee covers, not only XMH's obligations under the participation agreement (to which ERC was not a party), but also XMH's funding obligations under the loan agreement (to which ERC was a party). Accordingly, the fourth cause of action should not have been dismissed. Concur—Andrias, J.P., Friedman, Moskowitz and Román, JJ.

Catterson, J. who dissents in part in a memorandum as follows: Because, in my opinion, the majority misapprehends the basic premise of participation interest lending, I must respectfully dissent. In my view, the loan agreement imposes no funding obligation such as would give rise to a breach of contract action in the event of a default by Xanadu Mezz Holdings LLC (hereinafter referred to as XMH). It is undisputed that XMH did not agree to section 2.9.2 (a) which is the section that imposes contractual funding obligations on the lenders, but not on the closing date participants. The four sections of the loan agreement to which XMH did agree are, in my opinion, unambiguous as to XMH's status and its rights and obligations as a closing date participant. Moreover, the provisions unequivocally circumscribe any action that ERC may take against a defaulting closing date participant like XMH.

Section 2.9.2 (e) contains the provision that failure to fund by a closing date participant is governed explicitly by sections 2.9.2 (f) and (g). In my opinion, the majority clearly misreads the rights of the borrower arising out of those provisions: While 2.9.2 (f) states that the borrower, and agent or any other closing date participant may "proceed directly" against a defaulting closing date participant, such action in the borrower's case is limited, as section 2.9.2 (g) makes clear, to "obtain[ing] an [e]ligible [a]ssignee to replace [d]efaulting [c]losing [d]ate [p]ar-

---

**2.** We note that this definition confirms that the parties to the participation agreement understood that XMH, as a closing date participant, had an obligation under *both* the participation agreement and the loan agreement to fund its ratable portion of advances on the loan.

ticipant." As set forth more fully below, it is clear that those rights do not include the right to commence a breach of contract action directly against a defaulting closing date participant.

The majority's view that the provisions as interpreted in this dissent would compel a "harsh result" appears to be based on the flawed premise that ERC would be placed "at the mercy of a defaulting assignee for which no substitute could be found." The loan agreement barely contemplates such a situation. On the contrary, section 2.9.2 (f) characterizes the opportunity for any other closing date participant to advance the defaulting participant's ratable share as *a right*.

In my opinion, the majority's position is a result of viewing this action through the prism of the current harsh economic climate. The majority therefore fails to see that in 2007 (when the monthly LIBOR rate was more than 5%) loan participation in a commercial development such as Xanadu would have been a highly sought after opportunity comparable, at that time, to the opportunity of investing with a consistently successful high yield private fund, e.g. Bernie Madoff. Hence, the sophisticated parties in this complex commercial deal which ostensibly promised a high return on investment actively sought out this opportunity. Any scenario involving a situation where ERC would be unable to find a substitute investor would necessarily have been part of the risk of the opportunity, offset by the high rate of return.

The facts of record are as follows: On March 30, 2007, plaintiff, ERC 16 W Limited Partnership (hereinafter referred to as ERC), the developer of a sports, leisure, entertainment and shopping complex at the Meadowlands Sports Complex in East Rutherford, New Jersey, entered into a $1.015 billion construction loan agreement with a group of lenders and closing date participants. The loan agreement's preamble defined Lender/Lenders as follows: "the lenders identified on the signature pages hereof (such lenders, together with their respective successors and assigns, individually a 'Lender', and collectively the 'Lenders' ''). Pursuant to section 2.9.2 (a) which states, "[l]enders *shall make* the requested Advance," (emphasis added) only the lenders have an obligation to fund. The entities who signed the agreement as lenders were Capmark Finance Inc., who was also designated as the agent, Capmark Bank, Column Financial, Inc., and NRFC WA Holdings, LLC.

The loan was evidenced by promissory notes issued by ERC in favor of the four lenders including one to Column in the amount of $485 million. On the same date, Column entered into a participation and servicing agreement with Capmark Finance

whereby Column created four participation interests in the $485 million note. Column was the initial participation holder of all four participation interests.

Also on the same day, Column assigned to XMH one of the participation interests, that being the "junior participation interest" described as "subordinate" to the other three participation interests. Pursuant to the assignment and assumption agreement, Column assigned its obligations as a participation holder to XMH in the amount of $208 million. ERC was not a signatory to either the participation agreement or the assignment and assumption agreement.

XMH joined Capmark Finance and Column to sign the loan agreement as closing date participants, each "for the sole purpose of acknowledging its agreement to Sections 2.9.2 (e), (f) and (g) and Section 2.11 of this Agreement." XMH was the only closing date participant which, on May 30, 2007 was not also a lender.

Subsequently, XMH, at the agent's instruction, funded ERC on the first eight requested advance dates between December 2007 and September 2008 for a total of approximately $60 million. In October 2008, following a Chapter 11 filing by Lehman Brothers, XMH did not fund a requested $7 million pro rata portion of the advance. Again, in November 2008 it failed to fund a requested pro rata share of $8 million.

On November 10, 2008, ERC, XMH, and the other lenders and closing date participants entered into a cure agreement whereby XMH agreed to cure the October and November 2008 deficiencies. It also ratified and reaffirmed all of its covenants, agreements, and obligations under the loan agreement, the participation agreement, and the assumption agreement. The cure agreement specifically provided that it was not intended to "expand" any preexisting obligation.

XMH cured its deficiencies, and subsequently funded its pro-rata share of the December 2008 advance request which brought its total payments to ERC to approximately $84 million as of December 31, 2008. However, on the next advance due date of January 2, 2009, XMH did not fund the requested pro-rata share of more than $8 million. Capmark, as agent, served a notice of default on XMH on January 7, 2009. Neither XMH nor Lehman REM (a guarantor under a separate agreement with XMH) took steps to cure the default.

On or about February 24, 2009, Capmark, as agent, demanded that, pursuant to § 2.9.2 of the loan agreement, ERC fund XMH's deficiencies pending the replacement of XMH by a new lender or loan participant. Thereafter, to keep the project mov-

ing forward, ERC again paid deficiencies to cover two further advances requested of, but not funded by XMH, in March 2009 and April 2009. However, a replacement lender/participant was never obtained, given the economic times and difficult lending market.

In early 2009, ERC commenced the instant action against XMH and Lehman REM for, inter alia, breach of contract. It subsequently filed an amended complaint alleging that XMH's obligations as a lender arose out of section 2.9.2 (e) and were incorporated by reference by one of the definitions contained in this section. The motion court dismissed the amended complaint on the grounds "that [XMH] is not a party to the contractual provisions of which [p]laintiff alleges a breach."

In my opinion, the motion court was correct. It is not disputed that the only agreement signed by both ERC and XMH is the loan agreement, and that XMH specifically agreed to only four sections. It is further undisputed that sections 2.9.2 (a) and 2.1, which impose contractual funding obligations exclusively on the lenders, were not among the sections to which XMH agreed. Of the four sections in the loan agreement agreed to by XMH, section 2.9.2 (e) provides, in relevant part, that: "Borrower agrees that for purposes of funding Advances hereunder and funding any Deficiencies, the Lender holding the $485MM Note shall not be responsible for funding its Ratable Share of each Advance; instead, each Closing Date Participant shall be treated in the same manner as each Lender, with each such Closing Date Participant holding a Ratable Share equal to its Closing Date Participant Share and a Maximum Commitment equal to its Closing Date Participant Maximum Commitment, and *the provisions of Section 2.9.2 (f) and (g) below shall govern the failure of any Closing Date Participant to fund its Closing Date Participant Ratable Share* of any Advance on the Requested Advance Date" (emphasis added).

As a threshold matter, it should be noted that, at oral argument, ERC's counsel agreed that the phrase "instead, each closing date participant shall be treated in the same manner as each lender" did not turn closing day participants into lenders for every provision of the 172-page loan agreement. Certainly, they are not so treated as to rights and remedies. Section 2.12 specifically states, in relevant part, that each closing date participant agrees that "it shall have no rights or remedies under or relating to this [a]greement . . . other than those which are directly related to [the four] sections of this [a]greement."

ERC argues instead that, because XMH agreed to be "treated in the same manner as each [l]ender" in section 2.9.2. (e), the

funding obligation sections (2.9.2 [a] and 2.1) are incorporated by reference. Therefore, ERC argues, XMH is contractually obligated to fund the loan advances.

In my opinion, ERC's argument is unpersuasive and self-serving. Nor does the selection of just two sections, rather than all sections referring to lenders, make sense under basic rules of contract construction. On the contrary, it begs the question as to why such a fundamental obligation to directly fund was not simply added to the list of sections as a plainly stated provision agreed to by XMH.

In any event, to accept ERC's argument that the phrase "treated in the same manner as each [l]ender" turns closing date participants into lenders for funding obligation purposes would render meaningless the other sections of the loan agreement to which XMH agreed. (*See e.g. Bailey v Fish & Neave*, 8 NY3d 523, 528 [2007] ["agreements should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases"]; *see also Acme Supply Co., Ltd. v City of New York*, 39 AD3d 331, 332 [1st Dept 2007], *lv denied* 12 NY3d 701 [2009] ["(a)n interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation" (internal quotation marks omitted)].)

Section 2.9.2 (e) explicitly negates any suggestion that closing date participants have a contractual obligation to fund the advances in the same manner as lenders, because it states that the "[b]orrower agrees [. . .] the *provisions of Section 2.9. 2 (f) and (g) below shall govern the failure of any Closing Day Participant to fund its Closing Day Participant Ratable Share of any Advance*" (emphasis added). Moreover, those sections together with section 2.11 deal solely with the available rights, remedies and procedures to be followed in the event of a failure to fund by a closing date participant. They do not include the borrower's right to commence an action for breach of contract directly against a closing date participant. Instead, they provide for different actions to be taken at different stages of a default not only by ERC, but by the lenders, agent and other closing date participants.

Sections 2.9.2 (f) and (g) provide for a 60-day period from the request for an advance during which other closing day participants have the *right*, but not obligation, to step in and fund a closing day participant's deficiency; if no such "[e]llecting [c]losing [d]ate [p]articipant" comes forward, subject to certain limitations, the non-defaulting closing date participants "shall fund the . . . [d]eficiency." However, during the same "said sixty (60)

day period" the borrower and/or agent have the right (arising out of the default) to use "commercially reasonable efforts" to obtain an eligible replacement assignee. Hence, in my view, the plain meaning of "proceed[ing] directly" is that the borrower need not wait 60 days for any or all other closing date participants to replace the defaulter. At this point, the borrower has the right, pursuant to section 2.11, by giving written notice, "to elect to cause the [defaulting] [c]losing [d]ate [p]articipant . . . to assign its [p]articipation . . . to one or more [e]ligible [a]ssignees." If, after 60 days, no other closing date participant or eligible assignee is found, only then is ERC as the borrower obligated to repay the non-defaulting closing date participants, if any, who funded the deficiency and to fund future deficiencies.

ERC's alternative claim that XMH breached the loan agreement as a lender, is also, in my opinion, not sufficiently supported in the record, notwithstanding the description of XMH as a "lender and closing date participant" in one of attached documents to the cure agreement. I agree with XMH that ERC is clutching at a proverbial straw in making this argument since the exhibit, which is not initialed or signed, is the only document where XMH is so identified. The cure agreement to which it is attached clearly states that the reaffirmations of XMH's preexisting obligations are "not intended to expand, and shall not be construed as expanding, in any respect, the scope any of [sic] said covenants, agreements or obligations of [XMH] . . . under the Loan Agreement, the Participation Agreement, the [Assignment and Assumption Agreement] . . . or the Subparticipation Agreement." Moreover, XMH signed the cure agreement only as a "Subparticipation B Party" not as a lender.

Nor does the one-page assignment and assumption agreement make XMH a lender subject to all the terms of the loan agreement despite the preamble in the loan agreement that the agreement binds ERC and the lenders and their "successors and assigns." In this case, the assignment to XMH was of a participation interest, the creation of which is governed by an agreement to which ERC was not a signatory. Moreover, section 10.23 of the loan agreement draws a clear distinction between assigns of interest in the loan by the original lenders (governed by section 10.23 [b]), and the assigns of participation interests by participation holders (governed by 10.23 [e] [ii] and 10.23 [h]).

For all the foregoing reasons, I believe the decision of the motion court should be affirmed in its entirety.