Platinum
Equity Advisors, LLC, Platinum Equity Capital Partners, L.P., Platinum Equity Capital
Partners-A, L.P., Platinum Equity Capital Partners-PF, L.P., and Platinum Eagle
Principals, LLC, Plaintiffs/Counterclaim, Defendants,

against
SDI, Inc., F/K/A Strategic Distribution Holdings, Inc.,
Defendant/Counterclaim Plaintiff.


653709/2013

For Plaintiffs:
Jill L. Foster, Mark S. Baldwin, and Dylan P. Kletter
Brown Rudnick LLP
For Defendant:
Joel M. Miller and Nicholas
Cutaia
Miller & Wrubel P.C.


Eileen Bransten, J.

This action stems from an April 28, 2011 transaction, whereby Plaintiffs Platinum
Equity Capital Partners, L.P., Platinum Equity Capital Partners-A, L.P., Platinum Equity
Capital Partners-PF, L.P., and Platinum Eagle Principals, LLC (collectively "Sellers")
sold all shares in a corporation then known as Project Eagle Holding Corporation
("Project Eagle") to Defendant SDI, Inc. ("SDI" or "Purchaser").[FN1]
Purchaser now claims that the Sellers breached several of the representations and
warranties made in the Stock Purchase Agreement ("SPA") that effected the transaction.
In turn, Sellers and their representative, Plaintiff Platinum Equity Advisors, LLC
("Sellers' Representative") contend that Purchaser breached the parties' Escrow
Agreement by submitting an invalid claim notice and retaining the escrowed funds after
they were released.
Both Plaintiffs and Defendants now move for summary judgment (motion sequence
numbers 013 and 014). In addition, Plaintiffs seek dismissal of SDI's claims in their
entirety on spoliation grounds (motion sequence number 015). All three motions are
opposed. For the reasons that follow, Plaintiffs' motion for summary judgment is granted
in part and denied in [*2]part, and Defendant's motion for
summary judgment is granted. Finally, Plaintiffs' motion for spoliation sanctions is
denied.
I. Background
A. Stock Purchase Agreement
On April 28, 2011, Sellers entered into the Stock Purchase Agreement ("SPA"),
through which Project Eagle was sold to Defendant SDI. Sellers made several
representations and warranties to SDI in the SPA, four of which are relevant to the
instant motions:

Section 4.07 — Financial Statements: provides that the
Seller's financial statements were "prepared in accordance with GAAP, are based on the
books and records of the Company and fairly present in all material respects the
consolidated financial position of the Company Entities as at the respective dates thereof
and the consolidated statements of operations and cash flows of the Company Entities for
the periods indicated "
Section 4.25 —
Suppliers and Customers: makes identical representations as to the Seller's "top ten"
suppliers and customers, as identified on a disclosure schedule appended to the SPA. The
representations state that as of April 29, 2011, "there are no material disputes with any
such [top ten supplier or customer] and no Company Entity has received notice from
any such [top ten supplier or customer] of its intention to cancel or otherwise terminate
its relationship with, or to materially reduce its business with, any of the Company
Entities.
Section 4.20 — Taxes:
provides, inter alia, that "the Company has in all material respects paid when due
(or is contesting in good faith) all Taxes required to be paid by
it."
Section 4.29 — Full Disclosure:
states that "[n]o representation or warranty by Sellers in this Agreement and no statement
contained in any Disclosure Schedule to this Agreement contains any untrue statement
of a material fact, or omits to state a material fact necessary to make the statements
contained therein, in light of the circumstances in which they are made, not
misleading."
Under Sections 9.04 and 9.10 of the SPA, SDI's
potential damages for any breach of these representations is capped at $7,000,000 unless
SDI can establish "intentional breach or fraud."
B. The Indemnity Escrow Fund
Relevant to Platinum's instant motion, Section 2.03(f) of the SPA provided for the
establishment of an Indemnity Escrow Fund ("Escrow"), into which SDI deposited $5
million of the purchase price for the transaction at the time of closing. As explained by
Plaintiffs, the Escrow was intended to provide a source of payment for SDI in the event it
was entitled to indemnification under one of the applicable provisions of the SPA. The
Escrow Agreement [FN2]
described the mechanism for such payments.
Specifically, Section 4.1 of the Escrow Agreement provides that SDI was required to
submit a claim notice to Plaintiff Platinum Equity Advisors, LLC, i.e., the Sellers'
Representative, and former party TD Bank [FN3]
detailing "the facts giving rise to such indemnity [*3]rights and estimat[ing] the amount of the liability arising
therefrom " Pursuant to Section 9.1 of the Escrow Agreement, any such notice "shall
only be valid if signed by a person listed on Exhibit B under the heading of the Company
and the Sellers' Representative, as applicable."
C. The Sellers' Representative's Complaint
In August and November 2012, SDI made claims for indemnification under the
Escrow Agreement's terms and served notices of its claims on the Sellers' Representative
and TD Bank. The Sellers' Representative contends that SDI's notices were defective and
in breach of the Escrow Agreement. Nevertheless, in December 2012, non-party TD
Bank released the Escrow to SDI. 
After demanding return of the Escrow, the Sellers' Representative filed a
seven-count complaint, of which two claims against SDI now remain: breach of the
Escrow Agreement and breach of the SPA. Only the first claim for breach of the Escrow
Agreement is at issue on the instant motions.
D. SDI's Complaint
In turn, SDI filed a single count complaint, asserting breach of contract against
Sellers. SDI contends that Sellers breached the several of the SPA's representations and
warranties, including, inter alia, the Financial Statements, Suppliers and
Customers, and Taxes representations in the SPA, as well as made misrepresentations
regarding Platinum's use of temporary workers.
II. Summary Judgment Motions
Plaintiffs and SDI each seek summary judgment. Plaintiffs move for dismissal of
certain of SDI's breach of contract claims, while SDI seeks summary judgment
dismissing Plaintiffs' claim for breach of the Escrow Agreement. These motions are
addressed in turn below.
A. Summary Judgment Standard
It is well-understood that summary judgment is a drastic remedy and should only be
granted if the moving party has sufficiently established the absence of any material issues
of fact, requiring judgment as a matter of law. Vega v. Restani Constr. Corp., 18 NY3d 499, 503 (2012)
(citing Alvarez v. Prospect Hosp., 68 NY2d 320, 324 (1986)). Once this showing
has been made, the burden shifts to the party opposing the motion to produce evidentiary
proof, in admissible form, sufficient to establish the existence of material issues of fact
which require a trial of the action. Zuckerman v. City of New York, 49 NY2d
557, 562 (1980). When deciding a motion for summary judgment, the Court must view
the evidence in the light most favorable to the non-movant. Branham v. Loews Orpheum
Cinemas, Inc., 8 NY3d 931, 932 (2007). However, mere conclusions,
unsubstantiated allegations or expressions of hope are insufficient to defeat a summary
judgment motion. Zuckerman, 49 NY2d at 562; see also Ellen v. Lauer,
210 AD2d 87, 90 (1st Dep't 1994) ("[it] is not enough that the party opposing summary
judgment insinuate that there might be some question with respect to a material fact in
the case. Rather, it is imperative that the party demonstrate, by evidence in admissible
form, that an issue of fact exists ...") (citations omitted).
B. Plaintiffs' Summary Judgment Motion (Sequence 013)
Plaintiffs now seek summary judgment dismissing SDI's contract claim insofar as it
alleges breach of the Financial Statements, Suppliers and Customers, Taxes, and Full
Disclosure [*4]representations in the SPA.[FN4]
Before turning to Plaintiffs' arguments regarding each representation, the Court first must
address Plaintiffs' arguments regarding the applicable summary judgment standard.
1. Plaintiffs' Proposed Standard
Plaintiffs contend that this Court must apply a "clear and convincing evidence"
standard to their summary judgment motion. Plaintiffs derive this standard from the
damages cap in Section 9.04 of the SPA. While the SPA limits SDI's damages for certain
indemnification claims to $7,000,000, there is no limitation on damages in cases
involving "any intentional breach or fraud." (SPA § 9.04.) Plaintiffs cite to Section
9.04's use of the word "intentional" to insist that SDI's breach claims are barred if the
wrongdoing alleged is not tortious in nature. Plaintiffs therefore contend that in order to
prevail on its claims, SDI must pierce the contractual limitation on damages by
demonstrating intentional wrongdoing. According to Plaintiffs, such a showing must be
made by clear and convincing evidence.
The Court disagrees. As a threshold matter, the relevant inquiry for a summary
judgment motion is the "existence of material issues of fact which require a trial of the
action." Zuckerman v. City of New York, 49 NY2d 557, 562 (1980).
Accordingly, summary judgment "is an exercise in issue-finding, not
issue-determination." Color by Pergament, Inc. v. Pergament, 241 AD2d 418,
420 (1st Dep't 1987). Therefore, at this juncture, the Court cannot apply a burden of
proof, such as clear and convincing evidence, in order to resolve factual disputes raised
by the parties; the Court can only identify if such disputes exist for trial. 
2. Application of the Damages Cap
Moreover, Plaintiffs appear to be placing the proverbial cart before the horse in
arguing that the damages cap determines whether Plaintiffs can be held liable for breach
of contract. The issues of liability and damages are distinct. Plaintiffs can be found liable
for breach of the SPA, and SDI's recovery thereunder can be capped at $7 million. If SDI
prevails on the issue of liability and then seeks to recover more than $7 million, SDI will
need to demonstrate that the cap on damages is inapplicable due to the existence of
"intentional breach or fraud" (emphasis added). 
While framed in the disjunctive, Plaintiffs contend that this "intentional breach or
fraud" language should be construed by the Court to require SDI to demonstrate fraud for
a recovery in excess of $7 million. (Platinum's Br. at 5 (quoting Metro. Life Ins. Co.
v. Noble-Lowndes Int'l, Inc., 84 NY2d 430, 438 (1994).) This argument, however, is
premised on Plaintiffs' extrapolation of a general rule from a fact-bound Court of
Appeals holding. In Metropolitan Life Insurance Co. v. Noble Lowndes International,
Inc., the Court of Appeals weighed the application of a contractual cap on
consequential damages, which provided an exception for "intentional misrepresentations,
or damages arising out of [defendant's] willful acts or gross negligence." Metro. Life
Ins. Co., 84 NY2d at 433. Based on this specific language, the Court determined that
the damages cap exception for "willful acts" under the contract between the
plaintiff-insurer and defendant-technology company would apply only to "conduct which
is tortious in nature, i.e., wrongful conduct in which defendant willfully intends to inflict
harm on [*5]plaintiff at least in part through the means of
breaching the contract between the parties." Id. at 438.
The instant contractual language is quite different. The damages cap language here
renders the $7,000,000 limitation inapplicable where SDI can demonstrate "intentional
breach or fraud." Thus, unlike Metropolitan Life Insurance Co. case, the
use of the contractual term "intentional breach" in the instant agreement demonstrates an
intent by the parties in this matter to lift the cap on damages for intentional
nonperformance of the agreement. See, e.g., Greenfield v. Philles Records, Inc.,
98 NY2d 562, 569 (2002) ("The fundamental, neutral precept of contract interpretation is
that agreements are construed in accord with the parties' intent."). Under these terms, the
Court declines to adopt Plaintiffs' narrow interpretation limiting the damages cap
exception to a showing of fraud.
3. Specific Representations
The Court turns now to the specific representations at issue on Plaintiffs' motion. As
discussed below, with two exceptions,[FN5]
Plaintiffs' papers highlight a host of factual issues that mandate denial of their summary
judgment motion.
a. Financial Statements Representation
In support of their motion, Plaintiffs argue that SDI's has "offered no evidence" that
Plaintiffs breached the Financial Statements representation of the SPA. Found at Section
4.07 of the SPA, this representation states that the financial statements given by Sellers to
SDI "were prepared in accordance with GAAP" and "fairly present in all material
respects the consolidated financial position of" Project Eagle.
Plaintiffs contend that SDI has offered no evidence that the 2010 financial
statements given to SDI as part of the due diligence process for the sale of Project Eagle
were "materially incorrect." Plaintiffs note that two accounting firms — KPMG
and Ernst & Young — reviewed the 2010 financial statements and found no
material errors. Accordingly, Plaintiffs assert that the Financial Statements representation
was not breached.
In opposition, SDI disputes that KPMG and Ernst & Young "blessed" the
Sellers' 2010 financial statements. SDI asserts that Ernst & Young withdrew the
audit opinion cited by Plaintiffs stating that "the 2010 Predecessor Financial Statements
should no longer be relied upon." See Affidavit of Andrew Belli Ex. 37.
Moreover, SDI states that the KPMG and Ernst & Young audits in the first instance
contained several disclaimers noting the difficulty of detecting fraud or intentional
misstatements where information was hidden from them. Id. Ex. 16, 20. SDI
claims that accurate financial information was withheld from the auditors. See, e.g.,
id. Ex. 39 (February 21, 2012 internal email stating that SDI's CFO was "forcing the
margin" by putting fake receivables in SDI's accounting records).
While Plaintiffs dispute the reasons for Ernst & Young's withdrawal of its
opinion and the import of this withdrawal, these disputes underscore the existence of
material facts in dispute for trial; they do not obviate them such that summary judgment
would be appropriate.Further, Plaintiffs' arguments as to whether certain errors were
intentional emphasizes the weakness of their summary judgment motion. See, e.g., Shisgal v. Brown, 21
AD3d 845, 847 (1st Dep't 2005) (noting that intent "is ordinarily a question of fact
which cannot be resolved on a motion for summary judgment"). Accordingly, Plaintiffs'
motion for summary judgment is [*6]denied as to the
Financial Statements representation.
b. Suppliers and Customers Representation
Plaintiffs next contend that SDI's claim for breach of Section 4.25 of the SPA
— the Suppliers and Customers Representation — must be dismissed.
Section 4.25 provides that as of April 29, 2011, "there are no material disputes with any
such [top ten supplier or customer] and no Company Entity has received notice from
any such [top ten supplier or customer] of its intention to cancel or otherwise terminate
its relationship with, or to materially reduce its business with, any of the Company
Entities."
First, Plaintiffs argue that summary judgment dismissing SDI's breach claim is
appropriate since SDI may or should have been aware of various supplier and customer
issues prior to closing and failed to conduct adequate due diligence. As a threshold
matter, SDI disputes that it was aware of the issues. While Plaintiffs contend that the
Sellers informed SDI that various customers and suppliers were not being timely paid
and were placed on "credit holds," see Pls.' Moving Br. at 16, SDI asserts that the
Sellers withheld information describing these problems. SDI points to various emails
detailing issues with various top ten suppliers and customers. One such purportedly
withheld email states "[t]he customer told us today that we are endangering our future
business with [top ten customer] Siemens CLT if we don't get this corrected with all
vendors ASAP. We are on credit hold now with Hagan Kennington whom provides
lubes for the direct side of the business. If we don't deliver these lubes we will shut the
plant down." (Belli Aff. Ex. 17.) Again, there are issues of fact as to whether any
"material" disputes existed with any customer or supplier and whether any customer or
supplier threatened to "materially reduce its business" with the company. Accordingly,
this claim cannot be resolved on summary judgment.
Next, even if there was some warning to SDI of a problem with the company's
suppliers and customers, such a warning in and of itself does not vitiate the Sellers'
representation as a matter of law. In CBS Inc. v. Ziff—Davis Publishing
Co., 75 NY2d 496 (1990), the Court of Appeals held that a buyer can recover for
breach of warranty even if it had formed doubts as to the truth of the warranted facts
prior to the closing. To hold otherwise "would have the effect of denying the express
warranties of their only value to [the purchaser]—i.e., as continuing promises by
[the seller] to indemnify [the purchaser] if the facts warranted proved to be untrue."
Id. at 506. The Court of Appeals noted that "[t]he critical question is not whether
the buyer believed in the truth of the warranted information .... but whether [the buyer]
believed [the buyer] was purchasing the [seller's] promise [as to its truth]." Id. at
503. There is an exception to this rule where a "buyer closes on a contract in full
knowledge and acceptance of facts disclosed by the seller which would constitute a
breach of warranty." Galli v. Metz, 973 F.2d 145, 151 (2d Cir. 1992).
Nevertheless, there is no such showing of full knowledge and acceptance here on this
motion, and in any event, the extent of SDI's knowledge and acceptance likely would
pose a question of fact for trial.
c. Taxes and Temporary Labor
Finally, Plaintiffs seek dismissal of the claim that they breached the Taxes
representation of the SPA, as well as the claim that the company's use of temporary labor
constituted a misrepresentation of the Full Disclosure representation. SDI offers no
opposition to Plaintiffs' motion as to these alleged breaches. Accordingly, Plaintiffs'
motion is granted and the breach of the SPA claim is dismissed as to these particular
allegations.
C. Purchaser's Motion for Summary Judgment (Sequence 014)
SDI next seeks summary judgment dismissing Sellers Representative's claim for
breach of the Escrow Agreement. For the reasons that follow, SDI's motion is
granted.
This claim stems from SDI's submission of an eight-page claim notice to Sellers'
Representative. Through the notice, SDI sought to recover from the Escrow fund, which
the parties agree was established in order to provide SDI with a source of payment in the
event it was entitled to indemnification under the SPA. 
The following facts are undisputed. On November 14, 2012, SDI issued the claim
notice to Sellers' Representative and non-party TD Bank. The notice was printed on SDI
letterhead and was executed by SDI's President and Chief Executive Officer, Andrew
Cvitanov. SDI sent the notice via fax, FedEx, and email to Sellers' Representative's
in-house counsel, as well as its outside counsel. The parties do not dispute that this notice
was received by Sellers' Representative on or about November 14, 2012. Under Section
4.2 of the Escrow Agreement, once Sellers' Representative received the claim notice, it
had twenty days to deliver a response instructing TD Bank to release all, some, or none
of the Escrow amount demanded in the claim notice. Sellers' Representative issued no
timely response. Therefore, under Section 4.2, TD Bank released the full amount of the
Escrow funds demanded to SDI. For nearly a year, Sellers' Representative took no action
with regard to the released Escrow. However, after SDI filed a complaint in Pennsylvania
state court asserting tort claims arising from the sale of the company, Sellers'
Representative sent a letter to SDI, asserting that it failed to respond the claim notice
because it was defective.
Sellers' Representative then filed the instant claim for breach of the Escrow
Agreement, premised on the invalidity of SDI's notice. Specifically, Sellers'
Representative cites to Section 9.1 of the Escrow Agreement, which states that "[a]ny
instruction or notice" delivered by SDI pursuant to the Agreement "shall only be valid if
signed by a person listed on Exhibit B [to the Agreement]." Since Exhibit B to the
Agreement was left blank, Sellers' Representative maintains that the claim notice it
received, which signed by SDI's President and CEO on SDI letterhead, breached Section
9.1 and that SDI's receipt of funds was improper.
SDI seeks dismissal of this breach claim, asserting that its claim notice complied
with the terms of the Escrow Agreement as a matter of law, and that even if the claim
notice were not in conformity with the Agreement, Sellers' Representative waived its
right to object by failing to respond to the notice for nearly a year. The Court agrees.
1. Validity of the Claim Notice
Sellers' Representative challenges the claim notice on the grounds that it was not
signed by the correct individual, since no such individual was specified for the task by
SDI in Exhibit B to the Escrow Agreement. This construction of the Escrow Agreement,
however, would render SDI unable to recover any Escrow funds under any
circumstances, notwithstanding the parties' agreement that the purpose of the Escrow
Agreement was to provide such a recovery mechanism for SDI.
It is well-settled under New York law that "a contract should not be interpreted to
produce an absurd result, one that is commercially unreasonable, or one that is contrary
to the intent of the parties." Cole
v. Macklowe, 99 AD3d 595, 596 (1st Dep't 2012); see also ERC 16W Ltd. P'ship v.
Xanadu Mezz Holdings LLC, 95 AD3d 498, 503 (1st Dep't 2012) ("It is a
longstanding principle of New York law that a construction of a contract that would give
one party an unfair and unreasonable advantage over the other, or that would place one
party at the mercy of the other, should, if at all possible, be avoided.").
If a contract interpretation "depends on formalistic literalism,' ignores common
sense, and could lead to absurd results that would leave [another portion of the contract]
without meaning," the Court may reject such a reading and adopt in its stead a
construction that "produces a commercially reasonable and practical result." Greenwich Capital Fin. Prods., Inc.
v. Negrin, 74 AD3d 413, 415 (1st Dep't 2010); see also Castellano v. State
of NY, 43 NY2d 909, 911 (1978) ("To carry out the intention of a contract, words
may be transposed, rejected, or supplied, to make its meaning more clear.").

Here, the plain language of the Escrow Agreement confirms the parties' intent to
create a fund to serve as a source of payment to SDI for indemnity claims arising from
the SPA. The preamble to the Agreement states: "WHEREAS, at the Closing, the
Purchaser (or the Company on behalf of the Purchaser) shall pay $5,000,000 , which
amount shall be held in a segregated account, to serve as a source of payment of any
amount owed to any of the Purchaser Indemnitees by the Sellers pursuant to the
indemnification obligations set forth in Article IX of the [SPA]." (Escrow Agreement at
1.) The remainder of the Agreement gives effect to that purpose.
Given this clearly expressed intent of the parties, the Escrow Agreement cannot be
interpreted in a manner that would serve to prohibit SDI from submitting any claim
notice for the Escrow. This is particularly so given the facts of the instant case. SDI
submitted a claim notice signed by SDI's President and CEO and submitted on SDI
letterhead. Sellers' Representative does not dispute that a corporation may act through its
officers or agents. See, e.g.,
Kirschner v. KPMG LLP, 15 NY3d 446, 465 (2010).
Moreover, there is no dispute that this notice was delivered to Sellers'
Representative's inside and outside counsel in compliance with Section 8 of the Escrow
Agreement. Sellers' Representative admits that it received the notice on or about the day
it was sent and does not claim that any prejudice arose from the fact that the notice was
signed by an individual not listed on Exhibit B. See, e.g., Dellicarri v. Hirschfeld,
210 AD2d 584, 585 (3d Dep't 1994) ("Strict compliance with the contract's notice
provisions was not required, for defendants do not claim that they did not receive actual
notice or that they were in any way prejudiced as a result of this minimal
deviation.").

Sellers' Representative attempts to salvage its interpretation by citing to Siegel v.
Kentucky Fried Chicken of Long Island, Inc., 67 NY2d 792 (1986). Nonetheless, to
the extent applicable, Siegel serves to bolster SDI's construction of the notice
provision. In Siegel, the Court of Appeals examined specific contractual
language and held that a provision stating that notice must be given to the "Landlord"
could be satisfied either by notice to property's landlord or by notice to the "the
attorney named in the lease." Siegel, 67 NY2d at 793-94. In so holding, the
Siegel Court did not require strict compliance with the notice provision in the
lease and held that notice from the attorney — an individual not listed in the
provision — was valid. Courts interpreting Siegel have noted that where a
lease requires a notice of default to be sent by the landlord, notice may be sent by the
landlord's agent where "accompanied by proof of the agent's authority to bind the
landlord." Equator Int'l, Inc. v. NH Street Investors, Inc., 43 Misc 3d 251, 262
(Sup. Ct. NY Cnty. 2014) (emphasis added). Thus, to the extent that Siegel is
applicable to this case, it holds that an individual not listed in a notice provision may give
notice where that individual has the authority to bind the noticing entity. In the instant
case, the claim notice was sent by the President and CEO of SDI — an individual
with authority to bind the corporation. Therefore, if Siegel is applicable, it
nonetheless supports construing SDI's claim notice as valid [*7]under the Escrow Agreement.
2. Waiver
Next, even if the Sellers' Representative had a valid response to SDI's claim notice, it
failed to assert that objection within the twenty-day period set forth under Section 4.2 of
the Escrow Agreement. Accordingly, under Section 4.2, TD Bank properly released the
Escrow to SDI in the full amount demanded.
Sellers' Representative argues that it did not waive its right to object because it
learned of the released Escrow a year after the fact, upon receiving SDI's audited
financial statements. This contention overlooks two things: (1) the undisputed fact that
the Sellers' Representative received the claim notice the day it was sent and (2) Section
4.2's requirement that the Escrow be released in the event that the Sellers' Representative
failed to respond to such notice within twenty days. The subsequent receipt of SDI's
financial statements did not revive the Sellers' Representative's ability to object to TD
Bank's disbursal of the Escrow to SDI under Section 4.2. In addition, Sellers'
Representative's insistence that SDI acted deceptively in communicating with TD Bank
ex parte to request release of the Escrow is of no relevance. Section 4.2 required the
release of the Escrow given Sellers' Representative's failure to act.
***
Accordingly, the Court declines to bar SDI's
claim for breach of the Escrow Agreement, and SDI's motion for summary judgment
dismissing the breach of the Escrow Agreement claim insofar as it is based on the form
of the claim notice is granted.
III. Plaintiffs' Spoliation Motion
In the alternative, Plaintiffs seek dismissal of SDI's complaint in its entirety on
spoliation grounds. Plaintiffs contend that SDI failed to preserve documents generated by
representatives of non-party Celerant Capital — Nathan Kronfrost, Jamie Better,
and Don Rice — and its affiliate non-party Celerant Consulting. Since Kronfrost,
Better, and Rice allegedly participated in the due diligence and negotiation of the Project
Eagle transaction, Plaintiffs contend that their documents contain information relevant to
SDI's claims for breach of the representations and warranties in the SPA. Moreover,
Plaintiffs assert that documents pertaining to the diligence of the transaction resided on
Celerant Consulting servers, which were not preserved before (or after) the sale of
Celerant Consulting to non-party Hitachi. Since the documents from these custodians and
servers were not preserved, Plaintiffs contend that the documents have been
destroyed.
A. Spoliation Standard
CPLR § 3126 provides that "[i]f any party refuses to obey an order for
disclosure or willfully fails to disclose information which the court finds ought to have
been disclosed, pursuant to this article, the court may make such orders with regard to the
failure or refusal as are just, among them: 3. an order striking out pleadings or parts
thereof or dismissing the action or any part thereof " 
A party seeking sanctions under Section 3126 based on spoliation of evidence must
demonstrate that "(1) that the party with control over the evidence had an obligation to
preserve it at the time it was destroyed; (2) that the records were destroyed with a 
culpable state of mind'; and finally, (3) that the destroyed evidence was relevant to the
party's claim or defense such that the trier of fact could find that the evidence would
support that claim or defense." VOOM HD Holdings LLC v. EchoStar Satellite L.L.C., 93
AD3d 33, 45 (1st Dep't 2012); see also Ahroner v. Israel Discount Bank of NY 79 AD3d
481, 482 (1st Dep't 2010). The first element of this [*8]analysis is dispositive here.
B. Control
While Plaintiffs seek spoliation sanctions from SDI, Plaintiffs notably do not assert
any misconduct by SDI directly. Instead, Plaintiffs seek to punish SDI for the actions of
non-parties Celerant Capital and Celerant Consulting (collectively, "Celerant Entities"),
and their employees and consultants. Therefore, the threshold matter before the Court is
whether SDI exercised sufficient control over the Celerant Entities and its employees and
consultants such that SDI — which is not alleged to have failed to meet its own
obligations to preserve or produce documents relevant to this action — can be held
liable for spoliation sanctions based on the Celerant Entities' nonproduction.
As a general matter, sanctions for destruction of evidence are applied against the
entity responsible for the destruction of the evidence. See, e.g., O'Reilly v.
Yavorsky, 300 AD2d 456, 457 (2d Dep't 2002) (deeming spoliation sanctions
inappropriate where "it cannot be presumed that [sanctioned party] is the party
responsible for the disappearance of such evidence or, more importantly, that it was
discarded by [sanctioned party] in an effort to frustrate discovery."); McLaughlin v.
Brouillet, 289 AD2d 461, 461 (2d Dep't 2001) (concluding that plaintiff should not
be sanctioned for spoliation where plaintiff was not responsible for evidence
destruction); Hartford Fire Ins. Co. v. Regenerative Bldg. Constr. Inc., 217 AD2d
862, 864 (3d Dep't 2000) (same). 
Plaintiffs do not contend here that SDI destroyed the Celerant Entities' documents or
those of their employees and consultants. Instead, Plaintiffs argue that the Celerant
Entities should be deemed "the embodiment" of SDI, since SDI is the successor to the
holding company formed by Celerant with non-parties Pouschine Cook and LLR
(collectively "Purchasing Group") to complete the instant transaction. (Pls.' Reply Br. at
2.) In support, Plaintiffs point to the Purchasing Group's ownership interests in SDI.
Pouschine Cook and LLR are alleged to own 20.22% and 50.9% of SDI respectively,
while Celerant Capital's stake is 0.76% and Celerant Consulting's is zero. Id. at 3
(citing SDI's Opp. at 3.) Plaintiffs also note that representatives from the Purchasing
Group sit on SDI's Board of Directors. Id.
Initially, Plaintiffs' contentions as to Celerant Capital's ownership of SDI appear to
undermine their "control" showing, demonstrating that Celerant has control over SDI's
documents and not the inverse. Therefore, Plaintiffs' showing would be relevant, if at all,
to a motion to hold Celerant liable for SDI's spoliation but not the other way around.
Moreover, the facts of the instant case differ in type and kind from those found to
demonstrate control sufficient to impose spoliation sanctions on a non-party. For
instance, in Pegasus Aviation I,
Inc. v. Varig Logistica S.A., 118 AD3d 428 (1st Dep't 2014), the First
Department conducted a spoliation analysis and concluded that a corporation had
sufficient control over its direct subsidiary such that the corporation could be deemed to
have a duty to ensure that the subsidiary's documents were preserved.[FN6]
In making this determination, the First Department emphasized the nature of the
relationship between the "legally and organizationally [*9]distinct entities," which included: (1) the corporation's
status as the sole shareholder of the subsidiary; (2) the corporation's selection of the
members of the subsidiary's board; (3) the fact that the corporation's employees
formulated the business strategy of the subsidiary; and, (4) the corporation's admission
that it could obtain documents from the subsidiary upon request. Pegasus Aviation I,
Inc., 118 AD3d at 431. Moreover, both the corporation and the subsidiary were
parties to the action. Based on these facts, the Pegasus Aviation court concluded
that the subsidiary's electronically stored information was "sufficiently under the
[corporation's] practical control' to trigger a duty on their part to ensure that those
materials were adequately preserved." Id. at 431.
The facts in this case are quite different and do not demonstrate the "practical
control" found by the First Department. The Celerant Entities are not parties to this
action. SDI is not the sole shareholder of the Celerant Entities — in fact, it is not a
shareholder at all. There is no demonstration that SDI is involved in formulating
Celerant's business strategy and no admission that SDI could obtain Celerant's documents
on request. 
In short, the Pegasus Aviation court determined that a party with sole
ownership and control of another entity's business operations, like the parent
corporation's control over the subsidiary in that case, can be held liable for failure to
preserve the documents of the "downstream" entity's documents. In this case, Plaintiffs
seek to invert this holding, asking the Court to determine that SDI be charged with
"upstream" control over the Celerant Entities' documents, such that SDI be sanctioned
based on the conduct of an "upstream" non-party minority shareholder and its
non-shareholder affiliate. 
Based on the facts as presented by Plaintiffs, the Court concludes that the control
element has not been satisfied, and as a result, Plaintiffs' motion for spoliation sanctions
as to SDI is denied.
IV. Conclusion
Accordingly, it is
ORDERED that Plaintiffs' motion for summary judgment (motion sequence 013) is
granted to the extent that Defendants' breach of contract claim is dismissed insofar as it
alleges breach of the Taxes representation and breach based on the use of temporary
workers, and the motion is otherwise denied; and it is further
ORDERED that Defendant's motion for summary judgment (motion sequence 014)
is granted and Plaintiff Platinum Equity Advisors, LLC's claim for breach of the Escrow
Agreement is dismissed; and it is further
ORDERED that Plaintiffs' motion to dismiss Defendant's complaint on spoliation
grounds (motion sequence 015) is denied; and it is further
ORDERED that counsel are directed to appear for a pretrial conference in Room
442, 60 Centre Street, on August 2, 2016 at 10 AM.
Dated: June 7, 2016
New York, New York
Hon. Eileen Bransten,
J.S.C.



Footnotes

Footnote 1:SDI is owned in part by
three entities: (i) LLR Partners; (ii) Pouschine Cook Capital Management ("Pouschine");
and (iii) Celerant Capital ("Celerant") (collectively, referred to as the "Purchasing
Group"). 

Footnote 2:The parties to the
Escrow Agreement were (1) Plaintiff Platinum Equity Advisors, LLC, as the Sellers'
Representative; (2) SDI; and, (3) non-party TD Bank, as the Escrow Agent.
Footnote 3:Plaintiffs claims against
TD Bank were dismissed by the Court in its Decision and Order on motion sequence 004
(NYSCEF no. 134).

Footnote 4:These allegations are
only a subset of the breach allegations contained in SDI's Complaint. See SDI
Compl. ¶ 18 ("As stated more fully above, defendants have intentionally breached,
inter alia, Sections 4.07, 4.09(a), 4.25(a), 4.17(b), 4.20(b), and 4.29(a) of the
Stock Purchase Agreement.").

Footnote 5:The exceptions are the
Taxes representation and the temporary workers allegation, which are the portion of
Plaintiffs' motion that SDI failed to oppose.

Footnote 6:While the First
Department's decision in Pegasus Aviation I was reversed by the Court of
Appeals, the reversal was on other grounds and the Court left the control analysis intact.
See Pegasus Aviation I, Inc. v.
Varig Logistica S.A., 26 NY3d 543, 553-54 (2015) ("On this record, we see no
reason to disturb the unanimous finding of the lower courts that the MP defendants had
sufficient control over VarigLog to trigger a duty on its part to preserve the ESI.").